NO. 07-09-0101-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL A 

DECEMBER 1, 2009

______________________________


IN THE INTEREST OF D.D.D.K., C.E.K., JR. AND C.E.K., CHILDREN

_________________________________

FROM THE 320TH DISTRICT COURT OF POTTER COUNTY;

NO. 74491-D; HONORABLE DON EMERSON, JUDGE

_______________________________


Before CAMPBELL and HANCOCK and PIRTLE, JJ.


MEMORANDUM OPINON


          Appellants, Charles and Nancy, appeal from a final order terminating their parental
rights to their three minor children, D.D.D.K., C.E.K., Jr., and C.E.K.


 They assert: (1) the
trial court abused its discretion by admitting hearsay statements of sexual abuse;


 and (2)
the evidence is legally and factually insufficient to support the trial court’s findings that: (a)
Appellants knowingly placed or knowingly allowed the children to remain in conditions or
surroundings which endangered the physical or emotional well-being of the children; (b)
Appellants engaged in conduct or knowingly placed the children with persons who engaged
in conduct which endangered the physical or emotional well-being of the children; and (c)
termination of the parent-child relationship is in the children’s best interest. We affirm.
Background
          Nancy and Charles were married in November 1999. They had three children:
D.D.D.K., C.E.K., Jr., and C.E.K.


 On July 25, 2007, the Department of Family and
Protective Services (“the Department”) filed an original petition for termination of their
parental rights pursuant to section 161.001(1)(D) and (E) of the Texas Family Code.


 The
following evidence was adduced during the final termination hearing held December 9,
2008, and January 13, 2009. 
          In 2005, Charles and Nancy had been separated for a year. Nancy was living in
Dallas. Charles was living with his mother while his children were staying with his
grandmother. Charles’s brother, Glen, also stayed at his grandmother’s house. 
          When Charles returned from serving two weeks in jail for overdue traffic tickets, his
children accused Glen of molesting them. Charles reported the molestation and took the
children to The Bridge–Children’s Advocacy Center in Amarillo. Becky O’Neal, registered
nurse and sexual assault nurse examiner, performed a SANE examination on each child. 
During the examination, she thought it unusual that each child assumed the knee-chest
position with their head on the table and buttocks stuck up in the air without any guidance. 
She further testified all three children had immediate dilation of the anus which indicated
their anus was being opened frequently to allow something to be inserted. O’Neal believed
the children had been sexually assaulted multiple times.


 Charles subsequently took the
children to stay at the Salvation Army. Nancy returned to Amarillo and reunited with
Charles.
          In Fall 2006, Charles was laid off from his job. Nancy was using a substantial
amount of cocaine. Although Charles found temporary work, he quit in order to care for
the children because Nancy was unable. Later, he exhausted his unemployment
compensation and the family was living from motel to motel. Neither parent worked and
both parents were using drugs. Their only source of income was money Nancy received
from her relatives. 
          In May 2007, the family moved to the Ritz Motel and were staying in a single room
with two king-size beds. On July 23, Charles and Nancy smoked crack cocaine in their
bathroom while the children were asleep. Nancy then watched television and Charles went
to bed. Before 4:00 a.m., Charles left the motel room to get something to eat at a nearby
restaurant. Shortly thereafter, Nancy left the room to smoke a cigarette. As they left, both
parents noticed the tenants across the hall were awake, had their door open, and noticed
them leaving. Furthermore, both parents knew the persons staying across the hall were
drug users because they would sometimes pool their money in order for Charles to
purchase drugs for them. 
          When Nancy returned ten to fifteen minutes later, C.E.K. was jumping up and
down—whining. C.E.K. said someone had touched her and pointed to the room across
the hall. Nancy waited for Charles to return approximately twenty minutes later. Charles
looked at C.E.K. and knew something was not right. He suspected a homeless person
who stayed across the hall with the couple living there. He confronted them and they
denied being in Charles’s room. Charles then readied the children for school and took
them to a fast-food restaurant to eat breakfast. After dropping D.D.D.K. and C.E.K., Jr. at
school, he returned to the motel and packed their belongings. He also gathered bed linens
that might contain evidence of the sexual assault and drove to Walmart where he
purchased q-tips and swabbed C.E.K. in the parking lot. He then drove C.E.K. to the
hospital arriving at 10:30 a.m. Nancy accompanied them throughout but was asleep most
of the time. 
          After initially examining C.E.K., the other two children were brought in for a sexual
assault examination. Nurse O’Neal examined all three children. According to O’Neal’s
testimony, C.E.K. had an acute tear to the hymen and an abrasion with redness on the
face of the hymen. D.D.D.K. had an abrasion at the base of the hymen. She classified the
girls’ trauma as acute occurring within the last seventy-two to ninety hours. She opined the
trauma was caused by penetration of their sexual organs. She also determined all three
children had immediate dilation of their anuses; and, in her opinion, had been sexually
assaulted on more than one occasion. She further opined that the dilation was not the
result of the prior assaults in 2005 because their sphincter tone would have returned if
there had been no penetration since that time.
           Kari Neeley, an investigator for Child Protective Services, interviewed Nancy and
Charles. Due to their behavior, Neeley suspected they were on drugs. She asked each
of them to take a drug test. Initially, they refused but Neeley eventually convinced them
to permit her to take a hair sample for analysis. Samples were also taken from the three
children. All the samples, including those from the children, tested positive for cocaine. 
C.E.K., Jr.’s sample also showed the presence of methamphetamine. 
          Following the hospital visit, the children were placed in foster care and counseled
by Sarah Lynn Jennings, a therapist and counselor. At the time, C.E.K. was four years,
nine months old but functioning as a three year, one month old. Jennings met with C.E.K.
for forty counseling sessions and D.D.D.K. for thirty sessions. 
           During the sessions, both girls confided in Jennings that they had been sexually
abused at the motel multiple times by strange men while their parents were in the same
room. C.E.K. indicated the activity occurred when men were giving her parents money. 
C.E.K. also told Jennings that Charles had touched her twice in the vagina. C.E.K.
indicated she did not want to go back to the motel because “it is not safe there–I get hurted
there in my privates by the mens.” 
          D.D.D.K. confided she was hurt in the vagina and anus by strange men in the
bedroom and shower. She told Jennings that her parents just turned away and talked
when the men were doing these things to her. She also described being scared, hiding
under the furniture to avoid men, and eating bugs and trash. She was angry and confused
that her parents would remain in the room and do nothing while the men were hurting her. 
C.E.K. and D.D.D.K. told their caseworkers that they were afraid and did not want to return
to the motel.
          After the children entered foster care, D.D.D.K. and C.E.K. suffered from enuresis. 
Recently, D.D.D.K. stopped wetting the bed while C.E.K. was still wearing diapers at night. 
Both children repeatedly stimulated themselves and reportedly humped the bed. D.D.D.K.
sexually acted out with a male child on two occasions. C.E.K. threw uncontrollable fits and
at times was almost unconsolable. Jennings indicated the children had no bonds with
anyone.
           Jennings opined that, although D.D.D.K. and C.E.K. indicated they continued to love
and miss their parents, both children continued to fear they would not protect them. She
opined that, because the abuse occurred in the parents’ presence, seeing Charles and
Nancy would be detrimental psychologically for the children because the children would
likely feel afraid and unsafe in their presence. Accordingly, she recommended the parents
not even receive visitation.
          Jennings also testified the children were presently in environments where they 
could safely develop relationships with all their needs met. She recommended the children
continue with therapy and believed a loving, therapeutic environment might possibly avoid
the necessity of more intensive services. Her understanding from speaking with the
children was they did not want to return to Charles and Nancy because of the abuse that
occurred in their parents’ presence and their failure to protect them. She opined that
termination would provide the safety the children needed.
          Charles denied ever sexually abusing or prostituting his children. He admitted using
drugs and stated that he “could have been a little bit more alert because drugs do dense
your senses.” He also testified that, when they were at the motel, his wife’s drug use
affected her ability to care for their children. He further testified he: (1) had been drug-free
for a year; (2) was working two jobs; (3) currently attended Alcoholics Anonymous; (4)
attended church and received counseling from his pastor who was also his mentor; (5)
lived alone in a one-bedroom efficiency apartment; and (6) saved money to afford a larger
place for his children to live. On cross-examination, he testified he was uncertain whether
C.E.K. had been assaulted in the motel room, could not name his AA sponsor or identify
the twelve steps, indicated AA believed he was uncooperative because he would not admit
he was an addict, and claimed he was not an addict because he had found Christ. He
testified there was “no chance he [would] fall again as long as [he] can walk in the spirit of
God . . . .”
           Nancy testified that, with the exception of the incident with Uncle Glen, she was
uncertain whether the children were molested. She testified the last time she used drugs
was September 19, 2008, the day of her arrest for possession of cocaine. Prior to her
arrest, she filed a false complaint against her husband for assault in order to obtain income
tax money to buy drugs, at a time when they owed back rent and their utilities had been
turned off. She also testified her drug use did not affect her parenting skills and she did
not make bad decisions while she was on drugs. 
          Her plan to turn the family around was to find a job after she was released from
prison, take the classes she failed to complete as required by the service plan, get the
family into church, undergo any necessary counseling, change her surroundings and the
persons she associated with, and give her life to Christ. 
          Constance Priest, the children’s caseworker, indicated all three children were
receiving counseling and their placements were stable. After C.E.K., Jr. recently exhibited
assaultive behavior toward other children and his foster mother, however, he was being
transferred to a residential treatment center. 
          The Department’s current plan for the children was unrelated adoption. Priest
recommended the children not be returned to Charles and Nancy because two of the three
children implicated their parents in sexual abuse and remained relatively unstable nearly
a year and a half after coming into foster care due to their exposure to drugs and sexual
abuse. Further, although the Department initially sought placement with relatives, there
were no relatives willing or interested. D.D.D.K.’s foster parents, however, have expressed
an interest in adoption.
          Although Priest noted Charles had completed many recommended services,


 she
also testified Charles had not fully cooperated with CPS. She indicated: (1) he failed to
contact her regarding a requested drug test, (2) failed to maintain contact in order to avoid
scheduling drug screenings between January 2008 and October 2008, and (3) failed to
follow recommendations following his psychological examination. When Charles was
asked about counseling, he told Priest “[c]ounseling is the work of the devil . . . .” 
          At the conclusion of the proceeding, the trial court issued an order terminating
Charles’s and Nancy’s parental rights. On request, the trial court issued its findings of fact
and conclusions of law.



Discussion
          Charles asserts D.D.D.K’s and C.E.K.’s hearsay statements of sexual abuse should
have been excluded because the children’s testimony was unreliable. Charles and Nancy
also assert the evidence was legally and factually insufficient to support the trial court’s
findings that Appellants knowingly placed or knowingly allowed the children to remain in
conditions or surroundings which endangered the physical or emotional well-being of the
children, or engaged in conduct or knowingly placed with persons who engaged in conduct
which endangered the physical or emotional well-being of the children. Finally, Charles
and Nancy assert the trial court erred in its determination that termination of the parent-child relationship was in the children’s best interest.
          I.        First Point of Error — Hearsay Statements
          The Texas Family Code permits the admission of hearsay statements by child
abuse victims in termination-of-parental-rights proceedings. See Tex. Fam. Code Ann. §
104.006 (Vernon 2008). Section 104.006 provides that, under certain circumstances, a
statement made by a child twelve years of age or younger that describes sexual abuse
against a child is admissible. The statute allows admission of such a statement, providing:
(1) the court finds the time, content, and circumstances of the statement provide sufficient
indicia of the statement’s reliability, and (2) the child testifies or is available to testify at the
proceeding in the court, or in any manner provided for by law, or the court determines that
the use of the statement in lieu of the child’s testimony is necessary to protect the welfare
of the child.
          Whether a trial court erred in admitting hearsay evidence under section 104.006
depends on whether it abused its discretion, e.g., failed to follow controlling rules and
principles or the decision to admit the evidence lacked evidentiary support. In re P.E.W.,
105 S.W.3d 771, 774 (Tex.App.–Amarillo 2003, no pet.). 
          Charles asserts the trial court abused its discretion in admitting the evidence
because D.D.D.K’s and C.E.K.’s statements were obtained through the use of leading
questions and the result of coaching by their foster parents. He also asserts the
statements are unreliable because the children are functioning at less than their age levels
and he reported incidents of sexual abuse in 2005 and 2007. 
          Jennings was qualified as an expert without objection.


 She has seen D.D.D.K. and
C.E.K. in counseling sessions thirty to forty times respectively over a period of months. 
She testified the children’s statements were reliable and accurate because their accounts
of sexual abuse were consistent when told on multiple occasions and the children had not
seen each other for extended periods of time. Each child was telling the same story and
the stories continued to come out over time. 
          She also testified the children’s statements were consistent with what she had
learned about the children while counseling them. She testified their accounts of sexual
abuse disclosed information related to sex that a child of their age would not normally
know. Further, she was not troubled that the statements were inconsistent with other
statements following the 2007 incident because it was not uncommon for children who had
endured such abuse to open up later when they are less afraid. 
          The children’s statements were also corroborated by SANE Nurse O’Neal who
examined the two girls shortly after they left the motel. She testified both girls suffered
from acute trauma to their sexual organs and had immediate dilation of the anus indicating
multiple sexual assaults had occurred. That the children were acting out sexually after
removal, stimulating themselves and exhibiting predatory behavior also corroborates their
testimony. Moreover, there is no evidence of record that either child had a history of telling
falsehoods or that either child was motivated to not tell the truth.
          Charles asserts the statements were not in the children’s “language” and were
coached by the foster parents through leading questions.


 Jennings testified that, in her
opinion, the children’s statements were not coached and the foster parents had complied
with requests on how to follow up on the children’s statements with questions that were not
leading. It is well established that, in a bench trial, the judge as the trier of fact weighs the
evidence, assesses the credibility of witnesses and resolves conflicts and inconsistencies. 
Intec Systems, Inc. v. Lowrey, 230 S.W.3d 913, 920 (Tex.App.—Dallas 2007, no pet. h.). 
Thus, whether Charles or the children were to be believed was a credibility determination
best left to the trier of fact.



           Charles next asserts the children’s statements are unreliable because they were
functioning at less than their age levels. He also asserts their statements that he was
present when any sexual abuse occurred is refuted by his testimony that he reported the
incidents of sexual abuse in 2005 and 2007. The only evidence creating a nexus between
the functionality of the children’s age levels and the reliability of their statements is
Jennings’s expert testimony that the children’s statements were accurate and reliable. 
Next, whether Charles’s reporting of the incidents in 2005 and 2007 renders the children’s
statements unreliable is a question best determined by weighing the evidence. This
determination is best made by the trier of fact–in this instance, the trial court; and,
apparently, the trial court did not find their testimony unreliable as evidenced by its findings
of fact. 
          “In sum, although the outcry statements were not definite as to time, the specificity
of the content and circumstances existing at the time of the outcr[ies] demonstrate the
statements’ veracity.” In re M.R., 243 S.W.3d 807, 815 (Tex.App.–Fort Worth 2007, no
pet.). Furthermore, there is evidence of record “touching upon various indicia which courts
often use to assess the reliability of a child’s outcry.” Id. See also Idaho v. Wright, 497
U.S. 805, 821, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990); Norris v. State, 788 S.W.2d 65,
71 (Tex.App.–Dallas 1990, writ ref’d).
          After considering the evidence before the trial court, and the statutory prerequisites
under section 104.006, we cannot say the trial court abused its discretion in admitting
Jennings’s testimony regarding D.D.D.K.’s or C.E.K.’s statements of sexual abuse.
Charles’s first point of error is overruled.
          II.       Legal and Factual Insufficiency
          While a parent’s rights to his children are of constitutional magnitude; In re M.S.,
115 S.W.3d 534, 547 (Tex. 2003), they are not absolute. In re C.H., 89 S.W.3d 17, 26
(Tex. 2002). Due process requires the Department to justify termination of parental rights
by clear and convincing evidence. §§ 161.001, 161.206(a); In re J.F.C., 96 S.W.3d 256,
263 (Tex. 2002).


 The higher burden of proof in termination cases elevates the appellate
standard of both legal and factual sufficiency review. See In re J.F.C., 96 S.W.3d at 264-65; In re C.H., 89 S.W.3d at 25. In conducting a legal sufficiency review in a termination-of-parental-rights proceeding, a court must review all the evidence in the light most
favorable to the verdict and determine whether the evidence is such that a fact finder could
reasonably form a firm belief or conviction that the grounds for termination were proven. 
In re J.F.C., 96 S.W.3d at 265-66. 
          In conducting a factual sufficiency review of a finding in a termination-of-parental-rights proceeding, we consider the entire record including evidence supporting and
contradicting the finding and determine whether a fact finder could reasonably form a firm
belief or conviction about the truth of the matter on which the State bears the burden of
proof. Id.; In re C.H., 89 S.W.3d at 25-26. “If, in light of the entire record, the disputed
evidence that a reasonable fact finder could not have credited in favor of the finding is so
significant that a fact finder could not reasonably have formed a firm belief or conviction,
then the evidence is factually insufficient.” In re J.F.C., 96 S.W.3d at 266.
          A.       Termination of Parental Rights
          In proceedings to terminate the parent-child relationship under section 161.001, the
Department must establish one or more of the acts or omissions enumerated under section
161.001(1) of the statute and must also prove that termination is in the best interest of the
child. § 161.001; In re S.M.L.D., 150 S.W.3d 754, 756 (Tex.App.–Amarillo 2004, no pet.). 
However, while both elements must be established; Tex. Dep’t of Human Services v. Boyd,
727 S.W.2d 531, 533 (Tex. 1987), only one finding under section 161.001(1) is necessary
to support a judgment of termination. In re W.E.C., 110 S.W.3d 231, 239-40
(Tex.App.–Fort Worth 2003, no pet.). 
          Here, the trial court found that Charles and Nancy had knowingly placed or
knowingly allowed the children to remain in conditions or surroundings which endangered
the physical or emotional well-being of the children and that they also engaged in conduct
or knowingly placed the children with persons who engaged in conduct that endangered
the children’s physical or emotional well-being. See § 161.001(1)(D), (E). Both
subsections (D) and (E) require proof of endangerment, which means to expose to loss or
injury, or to jeopardize a child’s emotional or physical health. Boyd, 727 S.W.2d at 533. 
 While endangerment means more than a threat of metaphysical injury or the possible ill
effects of a less-than-ideal family environment, it is not necessary that the conduct be
directed at the child or that the child suffer actual physical injury. In re A.B., 125 S.W.3d
769, 776-77 (Tex.App.–Texarkana 2003, pet. denied); Doyle v. Texas Dep’t of Protective
and Regulatory Services, 16 S.W.3d 390, 394 (Tex.App.–El Paso 2000, pet. denied). 
          Subsections (D) and (E) differ in one respect: the source of the physical or
emotional endangerment to the child. Subsection (D) requires a showing that the
environment in which the child is placed endangered the child’s physical or emotional
health, id., whereas, Subsection (E) requires that the cause of the endangerment be the
parent’s conduct alone, as evidenced not only by the parent’s actions but also by the
parent’s omission or failure to act. Doyle, 16 S.W.3d at 395. 
          The law does not require that the child be a victim of abusive conduct before the
Department can involuntarily terminate a parent’s rights to the child. In re C.J.F., 134
S.W.3d 343, 350 (Tex.App.–Amarillo 2003, no pet.). “Rather, if the evidence shows a
course of conduct which has the effect of endangering the emotional well-being of the
child, a finding under section 161.001(1)(E) is supportable.” Id. 
          1.        Second Point of Error – Environmental Endangerment
          Conduct of a parent or another person in the home can create an environment that
endangers the physical and emotional well-being of a child as required for termination
under subsection (D). In Interest of W.S., 899 S.W.2d 772, 776 (Tex.App.–Fort Worth
1995, no writ). Parental knowledge that actual endangering conduct has occurred is not
necessary; it is sufficient that the parent was aware of the potential for danger and
disregarded the risk. In re S.M.L., 171 S.W.3d 472, 477 (Tex.App.–Houston [14th Dist.]
2005, no pet.); In re S.G.S., 130 S.W.3d 223, 238 (Tex.App.–Beaumont 2004, no pet.); In
re A.B., 125 S.W.3d at 775. Inappropriate, abusive, or unlawful conduct by persons who
live in the child’s home or with whom the child is compelled to associate on a regular basis
in his or her home represents a part of the “conditions or surroundings” of the child’s home
under subsection (D). In Interest of M.R.J.M., 280 S.W.3d 494, 502 (Tex.App.–Fort Worth
2009, no pet.). The child is not required to suffer injury and the parent’s conduct need not
be directed at the child. In re M.C.T., 250 S.W.3d 161, 169 (Tex.App.–Fort Worth 2008,
no pet.). 
          As a general rule, conduct that subjects a child to a life of uncertainty and instability
endangers the physical and emotional well-being of a child. In re R.W., 129 S.W.3d 732,
739 (Tex.App.–Fort Worth 2004, pet. ref’d). Without question, sexual abuse is conduct
that endangers a child’s physical or emotional well-being. In re L.C., 145 S.W.3d 790, 796
(Tex.App.–Texarkana 2004, no pet.). Moreover, “evidence of sexual abuse of one child
is sufficient to support a finding of endangerment with respect to other children.” In re
R.W., 129 S.W.3d at 742. Thus, D.D.D.K.’s and C.E.K’s outcries of repeated sexual abuse
at the motel by the strange men in the presence of their parents established surroundings
which endangered the children


 including C.E.K., Jr.


 
          Furthermore, the record shows endangering conditions other than those relating to
sexual abuse. A parent’s drug use and its effect on a parent’s life and his or her ability to
parent may also establish an unstable home environment for a child. In re Z.C., 280
S.W.3d 470, 474 (Tex.App.–Fort Worth 2009, pet. denied); Vasquez v. Texas Dep’t of
Protective & Regulatory Servs., 190 S.W.3d 189, 196 (Tex.App.–Houston [1st Dist.] 2005,
pet. denied). The endangerment to these children is no where more self-evident than
their positive drug tests taken shortly after leaving the motel. In addition, Charles testified
the drugs he used at the motel dulled his senses and affected Nancy’s ability to care for
the children. 
          Additionally, Charles may have unreasonably delayed taking C.E.K. to the hospital
after he learned of the sexual assault. In fact, after learning of the assault, Charles and
Nancy delayed nearly six and one-half hours before taking C.E.K. to the hospital. Neither
parent called the police and both appeared to be under the influence of a controlled
substance at the hospital when interviewed by the CPS investigator. The subsequent drug
test confirmed there was cocaine in their system. From this evidence, the fact finder could
reasonably form a firm belief that Charles and Nancy delayed reporting the assault to avoid
the detection of drugs in the motel room and/or to use drugs between the time they learned
of the assault and when they took C.E.K. to the hospital. 
            Nancy contends there was no evidence that C.E.K.’s assault occurred as a result
of her drug use. The Department need not prove Nancy’s actions were directed at the
children or the children actually suffered injury as a result of her conduct. Boyd, 727
S.W.2d at 533. The specific danger to the child’s well-being may be inferred from the
parental misconduct. Toliver v. Texas Dep’t of Family and Protective Service, 217 S.W.3d
85, 98 (Tex.App.–Houston [1st Dist.] 2005, no pet.). Prior to the incident, Nancy had been
watching television for hours


 when her husband left to get something to eat. She then
left her children alone in a motel room at 4:00 a.m. to smoke a cigarette knowing drug
users directly across the hall were awake, had their door open, and observed her leaving.


 
Moreover, except to equivocate and profess ignorance, neither Charles nor Nancy offered
any rational explanation why, in addition to C.E.K., D.D.D.K. also suffered acute trauma
to her sexual organs in the preceding seventy-two to ninety hours and all of the children
showed signs of having undergone multiple anal sexual assaults. 
          Based on the foregoing evidence, we conclude the evidence was sufficiently clear
and convincing to support the trial court’s finding on this point. Looking at the evidence in
a light most favorable to the finding of the trial court, we conclude a reasonable trier of fact
could have formed a firm conviction that Charles and Nancy knowingly placed or allowed
their children to remain in conditions or surroundings that endangered their physical or
emotional well-being. Also, the disputed evidence on the matter is not so significant that
the trial court could not have formed a firm belief or conviction that its finding was true.
Charles’s second point of error and Nancy’s first issue are overruled.
          2.       Third Point of Error - Endangerment By Parental Act Or Omission
          While we recognize that an affirmative finding by clear and convincing evidence
satisfying one of the subsections of section 161.001(1) is sufficient to terminate parental
rights, see In re S.F., 32 S.W.3d 318, 320 (Tex.App.–San Antonio 2000, no pet.), in the
interest of fairness and certainty, we will address issues under (E) as well. See In re A.B.,
125 S.W.3d at 776. 
          A parent’s refusal to acknowledge responsibility for the child and protect him or her
from a situation that exposes the child to the risk of sexual abuse is grounds for termination
of parental rights under subsection (E). See In re L.C., 145 S.W.3d at 797-98; In re
J.M.C.A., 31 S.W.3d 692, 697-98 (Tex.App.–Houston [1st Dist.] 2000, no pet.); Lakes v.
Texas Dep’t of Human Services, 791 S.W.2d 214, 216 (Tex.App.–Texarkana 1990, no
writ). 
           Furthermore, drug addiction and its effect on a parent’s life and ability to parent may
also establish an endangering course of conduct. Latham v. Department of Family and
Protective Services, 177 S.W.3d 341, 348-49 (Tex.App.–Houston [1st Dist.] 2005, no pet.);
In re S.M.L.D., 150 S.W.3d at 758; In re R.W., 129 S.W.3d at 739. This is particularly so
where drug use continues even though the parent is aware that his or her parental rights
are in jeopardy. Latham, 177 S.W.3d at 348. Moreover, although mere imprisonment may
not be conduct that endangers the emotional and physical well-being of a child,
imprisonment as a result of a detrimental course of conduct endangering the child, such
as using illegal drugs, will establish facts sufficient to meet the requirement of subsection
(E). See In re S.M.L.D., 150 S.W.3d at 759; In re S.F., 32 S.W.3d 318, 322
(Tex.App.–San Antonio 2000, no pet.).
           The record here supports the trial court’s conclusion that both Charles and Nancy
had notice of sexual abuse to D.D.D.K. and C.E.K. The children testified that, while they
were at the motel, strange men engaged in sex acts with them while their parents were in
the room and C.E.K. testified the strange men gave their parents money. Further, Charles
had been out of work for nearly six months and Nancy was unemployed. Both parents
were using drugs and had daily drug habits


 costing between eighty to a hundred dollars
per day for both while their only source of income was money from their families. When
the children were examined at the hospital following the assault, they all showed signs of
being sexually assaulted more than once. In addition to C.E.K. having recent acute trauma
to her sexual organs, D.D.D.K.’s sexual organs also showed similar trauma. Further,
neither parent offers any rational explanation for the injuries suffered by their children,
equivocate whether they believe the children suffered any sexual abuse at all other than
the single episode involving C.E.K. and dismiss D.D.D.K.’s and C.E.K.’s outcries as
coached.


 
          After the Department filed suit to terminate Nancy’s parental rights, she continued
to engage in the course of conduct that had previously endangered her children. That is,
she continued using cocaine and only four months prior to the final hearing pled guilty to
possession of cocaine and was imprisoned. Moreover, her drug use is directly related to
her incarceration and subsequent inability to care for the children. Remarkably, at the final
hearing, Nancy testified she “did not make bad decisions on drugs,” “[drugs] really do not
have an effect on [her],” and “she does not think she has a drug problem.” 
          Further, the record reflects that Charles was aware of Nancy’s drug abuse but did
nothing about it. Rather, he also abused drugs. Charles testified he had last used cocaine
in January of 2008, almost six months after the Department filed suit to terminate his
parental rights. To his credit, he is working two jobs, has stayed drug-free for nearly a
year, and has cooperated with the Department to the extent that he completed many
required services.


 Nevertheless, despite Charles’s testimony that he stopped abusing
narcotics and progressed forward, the trial court was entitled to infer, based on evidence
that he failed to appreciate the need for treatment, that his substance abuse issues would
continue and would further jeopardize the children’s well-being. Between January 2008
and October 2008, Charles failed to maintain contact with CPS to schedule drug
screenings and did not respond to a specific request for a drug screen. Charles has also
exhibited a negative attitude towards counseling–labeling it the “work of the devil.” Further,
although he professes to attend AA meetings, he has no sponsor, cannot name the twelve
steps and doesn’t know which step he is on. Perhaps more telling, Charles testified at the
termination hearing that he “was really over those steps.”  
          Based upon this record, the evidence was sufficiently clear and convincing to
support the trial court’s findings that the children had been sexually assaulted on more than
one occasion while Charles and Nancy were present and their drug use negatively affected
their ability to provide a safe and stable home for their children. Viewing the evidence in
a light most favorable to the trial court’s findings, we conclude a reasonable trier of fact
could have formed a firm belief or conviction that its findings were true. Additionally, the
disputed evidence that a reasonable fact finder could not have credited in favor of the
finding is not so significant to prevent it from forming a firm belief or conviction, making the
evidence legally and factually sufficient. Charles’s third point of error and Nancy’s second
issue are overruled.
          B.       Best Interest of the Child
          A “best interest” finding does not require evidence on any certain set of factors, nor
does it limit the factors a fact finder may consider. Wilson v. State, 116 S.W.3d 923, 929
(Tex.App.–Dallas 2003, no pet.). We consider the following non-exclusive factors: (1) the
child’s desires; (2) the child’s present and future emotional and physical needs; (3) present
and future emotional and physical danger to the child; (4) parenting abilities of one seeking
custody; (5) available assistance programs to promote the child’s best interest; (6) plans
for the child by one seeking custody; (7) stability of the home or proposed placement; (8)
acts or omissions of a parent indicating the parent-child relationship is improper; (9) any
excuse for the parent’s acts or omissions. Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex.
1976). See In re A.C.B.,198 S.W.3d at 298. The Holley factors are not exhaustive, and
there is no requirement that the Department prove all factors as a condition precedent to
parental termination. See In re C.H., 89 S.W.3d at 27. Further, the best interest analysis
evaluates the best interest of the child, not that of the parent. Holley, 544 S.W.2d at 372. 
          Although there is no direct evidence concerning the children’s desires, Jennings,
their therapist and counselor, testified the children did not want to return to their biological
parents because of the abuse that occurred in their parents’ presence and their failure to
protect them. Jennings testified the children were fearful of their parents and felt no one
could protect them. She recommended against parental visitation because she believed
seeing their parents would be detrimental to the children psychologically. Accordingly, this
factor weighs in favor of termination. 
          All of the children require a safe and stable environment to continue the process of
building trust and relationships with others that foster feelings of security. The children
require counseling in conjunction with placement in a therapeutic foster home or residential
treatment center. It would be unrealistic to believe the biological parents could continue
the children’s treatment or meet their physical needs while Nancy is in prison and Charles
is working two jobs. This is particularly so in the absence of any evidence of a competent,
family support network. In addition, based on both parents’ reactions to D.D.D.K.’s and
C.E.K.’s outcries, it appears both parents are ill-equipped to respond to any future
emotional needs resulting from the sexual abuse. This factor also weighs in favor of
termination. 
          The same evidence we held was legally and factually sufficient to support the trial
court’s findings that termination was appropriate supports a finding that termination is in
the best interest of the children because both parents present future emotional and
physical dangers to the children. See In re C.H., 89 S.W.3d at 28; In re M.G.D., 108
S.W.3d at 511. The children were repeatedly exposed to sexual abuse; Green v. Texas
Dep’t of Protective & Regulatory Servs., 25 S.W.3d 213, 221 (Tex.App.–El Paso 2000, no
pet.) (“sexual abuse is a significant factor in determining whether termination is in the best
interest of the child”), and parental drug abuse. In re M.R., 243 S.W.3d at 820 (drug abuse
is a factor in analysis of child’s best interest). These facts weigh in favor of termination. 
          Evidence concerning their parenting abilities and failure to use available programs
also suggests termination is in the children’s best interests. The record reveals that both
parents continued to use drugs after their parental rights were in jeopardy. Only after
entering prison was Nancy able to curb her drug use. Although Nancy testified to her
current intent to seek drug rehabilitation once she is released from prison, there are no
assurances, nor can there be, that she will enter, or complete, such a program and remain
a sober and responsible mother to these children. Charles has shown some improvement
but, based on evidence of his uncooperative attitude toward counseling and the relatively
short time he has remained drug-free, the trial court was entitled to infer that his substance
abuse might resume and further jeopardize the children’s well-being. Further, based upon
the evidence of record of sexual abuse and the parents’ reactions to their children’s
outcries, the trial court was entitled to infer that the parents would not take full advantage
of programs available to assuage the effects of such abuse. 
          That neither parent has a specific plan for the children if they received custody also
weighs in favor of termination. See In re S.M.L.D., 150 S.W.3d at 761. Without more,
Nancy indicated she wanted her children to join a church and go to counseling. Putting
aside Charles’s drug abuse issues for a moment, he also offered no concrete plan to assist
the children in overcoming the effects of past sexual abuse. Further, although he is saving
for a larger place to live, he could not tell the trial court how much was saved and
advanced no plan for obtaining an alternative dwelling. 
           Priest, the children’s case worker, testified the children were receiving counseling
and their placements were stable. Their plan was for unrelated adoption. She testified
that, during the prior year and one half the children had been in foster care, their stay had
been relatively unstable due to their exposure to sexual abuse and drug use while living
with their parents. Although the children were currently in therapeutic foster homes,



C.E.K., Jr. was recently transferred to a residential treatment center because of assaultive
behavior. The Department initially sought placement with relatives but no relatives were
willing or interested. D.D.D.K.’s foster parents, however, have expressed an interest in
adoption. These facts also weigh in favor of termination.
          From these facts, a fact finder could have formed a firm belief or conviction that
termination of Charles’s and Nancy’s parental rights was in the children’s best interests. 
Accordingly, we hold that the evidence is legally and factually sufficient to support the trial
court’s finding that termination of their parental rights was in the children’s best interests.
Charles’s fourth point of error and Nancy’s third issue are overruled. 
CONCLUSION
          The trial court’s judgment is affirmed.




                                                                           Patrick A. Pirtle

                                                                                 Justice